IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br><br>DAVID GARY BURTON,<br><br>Defendant. | CR 12-18-H-DLC<br><br><br>FINDINGS &<br>RECOMMENDATION |

The government has charged Defendant David Burton in a four-count

indictment with being a felon in possession of a firearm, possession of stolen

firearms, robbery affecting commerce, and use of a firearm during and in relation

to a crime of violence.  Burton has moved to suppress all evidence obtained by law

enforcement as the result of what he claims was an unlawful investigatory traffic

stop.  Burton has also moved in limine to exclude voice-identification testimony

by his state probation officer.

Chief Judge Dana L. Christensen has referred Burton's motions to the

undersigned for findings and a recommended disposition.  The Court held a

hearing on the motion on April 23, 2013.  For the reasons detailed below, it is

recommended that Burton's motion to suppress be granted, and his motion in limine be denied.

## I. Factual Background

The Court makes the following factual findings based on the evidence and testimony presented at the suppression hearing. In the fall of 2011, the Lewis and Clark Sheriff's Office was investigating a string of burglaries in and around Helena, Montana. When Deputy Sheriff Christopher Weiss arrived at work early on the morning of December 19, 2011, he attended an internal law enforcement briefing. Part of that briefing related to a residential burglary that had taken place just a few days earlier, on December 15, 2011. Deputy Weiss was advised that a credit card stolen from the residence had later been used at the Green Meadow Market by someone seen on video from the store's surveillance system driving a black Ford F-250 pickup truck. A blue Ford Bronco also appeared in the video. The individual on the video was seen using the stolen credit card to fill both vehicles with fuel. It appeared that the individual was a male, but because he had his back turned to the camera it was not possible to see his face. Deputy Weiss was informed that on December 17, 2011, another deputy sheriff had located a pickup truck matching the one shown in the photographs at a residence on Shannon Court.

After the morning briefing, Deputy Weiss drove to the Shannon Court residence and found that the truck was still there. He verified that the truck looked identical to the one shown in still photographs from the Green Meadow Market's surveillance system, and learned upon running the license plate that Burton was the registered owner. Detective Weiss then approached the house and made contact with the homeowner, Mindy Harvey. Harvey told Deputy Weiss that Burton was her husband, and explained that he was not home and was in town running errands. Deputy Weiss told Harvey that he needed to speak with Burton. He left his business card with Harvey, and asked that Burton call him when he arrived back at the house.

Deputy Weiss then returned to the law enforcement center to gather additional information on Burton. He learned that Burton was on probation with the State of Montana for burglary convictions, and that his probation officer was Tom Chvilicek. Deputy Weiss contacted Officer Chvilicek, who advised him that Burton was currently self-employed as a roofer. That information prompted Deputy Weiss to contact the victim of a December 9, 2011, burglary because he was the owner of a roofing business. The business owner told Deputy Weiss that Burton had once worked for him, and so Burton became a suspect in that burglary as well. Deputy Weiss then asked Officer Chvilicek to meet him at Shannon Court

to conduct a probation search of Burton's vehicle and residence.

At 11:03 a.m, Deputy Weiss contacted Deputy Sheriff Eric Gilbertson and his trainee at the time, Deputy Sheriff Andrew Blythe. Deputies Gilbertson and Blyth had also attended that morning's law enforcement briefing session, and had viewed the images from the Green Meadow Market's video surveillance system. And sometime earlier that morning, they too had gone to the Shannon Court residence and concluded after comparing the pickup in the driveway that the vehicle matched that shown on the surveillance video. As Deputy Weiss prepared to make his way back to Shannon Court, he asked the two deputies to respond to the location to "sit on the house" and make sure that Burton's truck did not leave. Dkt. 28-1, at 2; Dkt. 36, at 44. Deputies Gilbertson and Blythe drove to the residence and parked nearby. From their vantage point on a road behind the house, the deputies could see the driveway and the rear end of the Ford F-250 pickup truck. Their view of the house itself was partially obstructed by a fence.

Within minutes of their arrival, the deputies saw a white sedan with a white male driver pass their parked vehicle and pull into the driveway. They watched the driver exit the vehicle, walk around to the rear of the house, and presumably enter by way of the back door. Because of the fence obstructing their view, however, neither deputy actually saw the individual enter the home. According to

-4-

Deputy Blythe, he advised Deputy Weiss that a male had arrived at the residence.
Dkt. 28-1, at 6. Deputy Gilbertson similarly testified that, to the best of his
recollection, they advised Deputy Weiss when the male arrived at the residence.
Dkt. 36, at 27.

A few minutes later,[1] at 11:17 a.m., Burton called the non-emergency
dispatch number – which was the telephone number on Deputy Weiss's business
card – and asked to speak with Deputy Weiss. At 11:19 a.m., the dispatcher
contacted Deputy Weiss and advised him that Burton was on the dispatch line
asking to speak with him. This led Deputy Weiss to believe that Burton was either
at the Shannon Court residence, or had spoken with Harvey. Because he was on
his way to Shannon Court, Deputy Weiss asked the dispatcher to get Burton's
number and indicated he would return the call later.

In the meantime, Deputies Gilbertson and Blythe were still stationed in their
vehicle near Shannon Court. A few minutes after Deputy Weiss's radio exchange
with dispatch, the two deputies observed the same male walk back to the white
sedan and drive away from the residence following the same route as before. The
sedan passed their parked vehicle once again, this time traveling in the opposite
direction. Deputy Blythe contacted Deputy Weiss on the radio at 11:30 a.m. and

---

[1] Dkt. 36, at 7.

stated: "That white vehicle that just passed us is him." Gov't Exh. 101. Deputy

Weiss then directed Deputy Blythe to "go stop him." Gov't Exh. 101.

It was at this moment that Deputy Weiss arrived on the scene. He too saw

the white sedan pass the deputies' parked vehicle, and observed that the driver was

a white male. But because he had never seen Burton before, he did not recognize

him as the driver. Deputy Blythe stopped the white sedan at Deputy Weiss's

direction, and the two of them approached the vehicle. Deputy Weiss made

contact with the driver and identified him as Burton.

Deputy Gilbertson, who had been acting as the cover officer on the

passenger side of the vehicle, observed a set of license plates lying on the floor in

the back seat passenger area. Deputy Gilbertson had dispatch run the licenses

plates, which came back to a blue and tan colored 1988 Ford Bronco previously

registered to Burton. This was potentially significant because of the Ford Bronco

shown on the video from the Green Meadow Market's surveillance system.

Deputy Weiss advised Burton that he wanted to speak with him about a

criminal investigation, and Burton agreed to return with the deputies to his house

on Shannon Court. Shortly after they reached the house, Officer Chvilicek arrived

on the scene as well. At the direction of Officer Chvilicek, Deputy Weiss read

Burton his *Miranda* rights, which Burton promptly invoked, expressly asking that

he be allowed an attorney. Deputy Weiss advised Officer Chvilicek about the surveillance videos, the black Ford pickup being registered to Burton, and told him that the license plates observed in the white sedan were for a Ford Bronco previously registered to Burton. There was no evidence presented that Officer Chvilicek had any knowledge regarding vehicles own by Burton or Mindy Harvey. Officer Chvilicek and Deputy Weiss then searched the white sedan, the Ford F-250 pickup truck, the interior of the residence, and an apartment above the garage. They were also assisted by Detective Sergeant David Peterson and Detective Dan O'Malley.

A camera mounted in one of the law enforcement vehicles captured some of what transpired on the scene, as did an audio recording device operated by Detective Weiss. Notwithstanding the fact that Burton invoked his *Miranda* rights, it is clear from the audio recording that at one point during his search of the white sedan, Officer Chvilicek asked Burton about the Ford Bronco. Burton told Officer Chvilicek that he had sold the Bronco about two weeks earlier to "a guy named Rodney." Gov't Exh. 100, 12:00:57-12:01:10. It is difficult to tell from the recording whether or not Burton also identified Rodney by his last name, Trimble. Burton's cell phone was, however, seized during the search. Gov't Exh. 100, 12:31:00-12:31:45; 28-1, at 25. There was no direct evidence that the

deputies and/or Officer Chvilicek learned of Rodney Trimble's last name by searching the contact information on Burton's cell phone. But the circumstantial evidence indicates this is what was done. In this regard, City Detective Ranalli's report establishes that during the probation search, the contacts list was searched. Dkt. 28-1, at 25. With the search of the white sedan complete, Officer Chvilicek placed Burton under arrest for a probation violation. Deputies Blythe and Gilbertson transported Burton to the Lewis and Clark County detention center.

After meeting with Burton at the detention center, Officer Chvilicek visited with City of Helena police detectives and viewed a surveillance video of a robbery that had taken place two days earlier at Bowser's Lucky Dog Casino. Officer Chvilicek identified Burton's voice on the audio recording from the robbery.

Later that afternoon, Officer Chvilicek and Sergeant Peterson returned to Shannon Court. Sergeant Peterson spoke with Harvey twice that day – during the initial search of the property and again when he returned with Officer Chvilicek. Before these conversations occurred, Sergeant Peterson knew the Ford Bronco had been sold to Rodney Trimble. Gov't Exh. 100, at 12:11:05 to 12:11:30. When he asked Harvey if the Bronco had been sold to Rodney, she confirmed it had.

Based upon learning the identity of Rodney Trimble from the Sheriffs Deputies, city detectives working in conjunction with the Sheriff's Department

were able to locate the Ford Bronco and Rodney Trimble on December 20, 2011. Dkt. 28-1, at 14-15. They arrested Trimble, who then provided additional evidence linking Burton to the robbery at Bowser's Bar and various firearms.

Burton was indicted in December 2012 on charges of being a felon in possession of a firearm, possession of stolen firearms, robbery affecting commerce, and use of a firearm during and in relation to a crime of violence. Burton moves to suppress all evidence obtained by law enforcement as a result of the December 19, 2011, traffic stop and to exclude voice-identification testimony by Officer Chvilicek.

## II. Discussion

### A. Investigative Stop

Burton argues that law enforcement did not have the reasonable suspicion necessary under the Fourth Amendment to justify the investigatory stop of his vehicle. Because the traffic stop was invalid, Burton maintains, all statements and physical evidence obtained by law enforcement as a result of the stop should be suppressed as fruits of the poisonous tree under *Wong Sun v. United States,* 371 U.S. 471, 488 (1963).

It is well-established that law enforcement officers may conduct an

investigatory stop of a vehicle, also known as a *Terry* stop,[2] if they have a

reasonable suspicion that an individual is involved in criminal activity. *See e.g.*

*United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002); *United States v. Thomas*,

211 F.3d 1186, 1189 (9th Cir. 2000). Reasonable suspicion "requires specific,

articulable facts which, together with objective and reasonable inferences, form a

basis for suspecting that a particular person is engaged in criminal conduct."

*Thomas*, 211 F.3d at 1189. "The reasonable suspicion standard 'is a less

demanding standard than probable cause,' and merely requires 'a minimal level of

objective justification.'" *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th

Cir. 2002) (*quoting Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The

government, of course, bears the burden of showing that an investigatory stop was

supported by reasonable suspicion. *See e.g. United States v. Johnson*, 936 F.2d

1082, 1084 (9th Cir. 1991) (government bears the burden of justifying a

warrantless search); *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

"In deciding whether a stop was supported by reasonable suspicion, the

court must consider whether 'in light of the totality of the circumstances, the

officer had a particularized and objective basis for suspecting the particular person

stopped of criminal activity.'" *United States v. Basher*, 629 F.3d 1161, 1165 (9th

---

[2] *See Terry v. Ohio*, 392 U.S. 1, 22 (1968).

Cir. 2011) (*quoting United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir.

2007)). This "determination is made with reference to the 'collective knowledge

of the officers involved, and the inferences reached by experienced, trained

officers." *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (*quoting

United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992)).

The collective knowledge "doctrine allows courts to impute police officers'

collective knowledge to the officer conducting a stop, search, or arrest" in two

situations. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). "The

first situation is where law enforcement agents are working together in an

investigation but have not explicitly communicated the facts each has

independently learned." *United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir.

2007). In that situation, the knowledge of each officer involved is imputed to the

officer making the stop. The second situation in which the doctrine may be

invoked is "where an officer...with direct personal knowledge of *all* the facts

necessary to give rise to reasonable suspicion...directs or requests that another

officer, not previously involved in the investigation, conduct a stop, search, or

arrest." *Ramirez*, 473 F.3d at 1033. Under that scenario, the knowledge of the

officer directing or requesting the stop is imputed to the officer who actually

executes the stop.

While the parties in this case have not specifically addressed the collective knowledge doctrine, it is nonetheless implicated here. The parties broadly frame the issue presented as whether or not "law enforcement" had reasonable suspicion for stopping Burton's vehicle. In doing so, the parties fail to account for the fact that it was Deputy Weiss who actually decided to make the traffic stop. There is no question that Deputy Blythe initiated the stop under the specific direction of Deputy Weiss. So, one way of looking at it would be to consider whether Deputy Weiss had direct personal knowledge of all the facts necessary to give rise to a reasonable suspicion when he directed Deputy Blythe to stop Burton's vehicle.

As *Ramirez* instructs, the collective knowledge doctrine may also be invoked where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned. Thus, another way of looking at the issue here would be to consider whether the Deputies Weiss, Gilbertson, and Blythe were in fact working together on an investigation and, if so, whether their collective knowledge of the facts was sufficient to give to the reasonable suspicion necessary to conduct an investigative stop.

Under either inquiry, the Court concludes that reasonable suspicion was lacking. To begin with, none of the deputies involved with the investigative stop

had any reason to suspect that a white sedan was somehow associated with Burton or any of the burglaries they were investigating. Deputies Weiss, Gilbertson, and Blythe had all been briefed about the Ford F-250 pickup and Ford Bronco seen on the Green Meadow Market's surveillance system video, but had not received any information suggesting that a white sedan might also be involved.

What little information the deputies did have was simply not enough to provide an objective basis for suspecting the white sedan's driver of engaging in criminal conduct. None of the deputies knew Burton or had ever seen a photograph of Burton or been given his description, and admittedly had no idea who was driving the white sedan. Deputy Blythe testified that he had viewed the still images taken from the Green Meadow Market's surveillance system, but because the suspect's back was turned he did not have a clear view of the man's face. Deputy Blythe explained that he could tell the person in the video was a white male, but could not otherwise identify him. Nor did he testify the white male in the sedan appeared to fit the physical description of the white male in the still images. Deputy Blythe further testified that he had absolutely no idea who the driver of the white sedan was before executing the stop, and was simply acting on orders from Deputy Weiss.

There is no indication that Deputy Gilbertson had any more reason than

Deputy Blythe did to suspect that Burton was behind the wheel. He did not recall seeing any images of the person using the stolen credit card on the still photographs taken from the Green Meadow Market's surveillance video. Deputy Gilbertson knew that Ford F-250 truck was registered to Burton and that he lived at the Shannon Court location, but he too testified that he had no idea was driving the white sedan until after the vehicle had been stopped.

Deputy Weiss was in much the same position. He knew what Deputies Gilbertson and Blythe both did, namely, that an unidentified male in a vehicle they had no reason to believe was associated with Burton or the burglaries had arrived at the Shannon Court residence and left minutes later. No one actually saw the man enter the residence, and so could not say whether he walked in as if he lived there or whether he waited to be allowed in as a visitor typically would. And while Deputy Weiss was informed by dispatch not long after the man's arrival at the residence that Burton had called in asking for him, that call could have come from anywhere.

Deputy Weiss decided to initiate the stop only after being advised by Deputy Blythe that Burton was driving the vehicle. As Deputy Weiss recalled while testifying at the suppression hearing, "When I got close to the house, I believe it was Deputy Blythe contacted me on the radio and said a white car

passed him, and that David Burton was driving the car." Dkt. 36, at 45.  As the

audio of that radio transmission reflects, Deputy Blythe's exact words were "that

white vehicle that just passed us is him."  Although Deputy Blythe did not identify

Burton by name, Deputy Weiss clearly took his statement to mean that Burton was

driving.  When asked why he believed Burton was behind the wheel, Deputy

Weiss stated it was because "[t]he other deputies told me it was, and I assumed

that they had dealt with [Burton] prior."  Dkt. 36, at 45.  Deputy Weiss could see

that a white male was driving, but he explained that because he had never

observed Burton before, he "did not know if that was him or not."  Dkt. 36, at 45.

Based on the information provided by Deputy Blythe,  Deputy Weiss

directed him to initiate the traffic stop.  Dkt. 36, at 45.   Deputy Weiss made clear

that he had no idea who the driver of the vehicle was, and was relying on Deputy

Blythe's observations when he made the decision to initiate the stop.   In fact,

Deputy Weiss went so far as to admit that if Deputy Blythe had not identified

Burton as the driver, he would not have had reasonable suspicion to stop the

vehicle.  Dkt. 36, at 69.

The government conceded as much at the suppression hearing, agreeing that

Deputy Weiss would not have had reasonable suspicion to make the stop if Deputy

Blythe had not identified Burton as the driver.  Dkt. 37, at 8.  The government

nonetheless argued the stop was justified for two reasons: "number one, the

deputies had a photo of Mr. Burton prior to this investigative stop and [] number

two, Deputy Blythe says over the radio, it's him."  Dkt. 37, at 8.

The problem with the first reason is that it just not supported by the record.

Deputy Blythe testified that he had never seen a photograph of Burton before he

initiated the traffic stop, and had no idea who was driving the vehicle.  Dkt. 36, at

13-14, 21.  Deputy Gilbertson did not recall ever seeing a photograph of Burton

either, and similarly testified that he did not know who was behind the wheel of

the white sedan until after they executed the stop.  Dkt. 36, at 26, 36.  Deputy

Weiss had no idea what Burton looked like either.   While he and Deputy Blythe

remembered seeing images of Burton on the Green Meadow Market's surveillance

system video, those images were so poor that they could not identify him and

could only see that he was a white male.  The audio  recording of the police

dispatch radio traffic on the morning in question reflects that the deputies had

photographs of the Ford F-250 pickup truck, but says nothing about any

photographs depicting Burton.  That is because there were none.

The problem with the second reason provided by the government as

justification for the stop is that by Deputy Blythe's own admission, he had did not

know who was driving the car.  While Deputy Weiss clearly took the statement

"its him" to mean that Burton was driving, Deputy Blythe has testified the he

actually had no idea who was driving.  Because no one inquired at the suppression

hearing, it not clear what exactly Deputy Blythe meant when he said "it's him."  It

may well be that he simply meant to identify the car and driver as the same ones he

had observed arriving at the Shannon Court residence minutes earlier.  Whatever

the case, Deputy Weiss took the statement to mean that Burton was driving.  And

without that positive identification, Deputy Weiss made clear that the "car would

not have been stopped."  Dkt. 36, at 69.

In assessing the totality of the circumstances and determining whether there

is reasonable suspicion in any given case, courts typically defer to the observations

and judgment of the law enforcement officers on the principle that those officers

"draw on their own experiences and specialized training to make inferences from

and deduction about the cumulative information available to them that 'might well

elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (*quoting United States v.*

*Cortez*, 449 U.S. 411, 418 (1981).  Thus, as the government so often asks it do in

cases like this, the Court will defer to the observations and judgment of the officer

on the scene.

As Deputy Weiss judged the totality of circumstances, he would not have had reasonable suspicion to make the stop had Deputy Blythe not identified the driver as Burton. Judging the facts that were available to Deputy Weiss against an objective standard, the Court reaches the same conclusion. All that could reasonably be inferred from those facts was that an unidentified man driving a car that no one had reason to associate with the burglaries arrived at Burton's residence and departed a short time later. Although Deputy Weiss also knew that Burton had called dispatch attempting to reach him, the use of cell phones is now so ubiquitous that it would not have been objectively reasonable for him to infer that Burton was necessarily calling from his residence.

Those facts were not enough to give Deputy Weiss a particularized and objective basis for suspecting that the driver of the white sedan was Burton. This is why Deputy Blythe's statement that the driver of vehicle was "him" is so critical. While law enforcement officer are typically entitled to rely on information provided by others in the investigation, that is so only when the information provided is itself reliable, or supported by reasonable suspicion. *Whitely v. Warden*, 401 U.S. 560, 568 (1971); *United States v. Hensley*, 469 U.S.

221, 230-31 (1985). As discussed above, Deputy Blythe had no idea that the man driving the vehicle was Burton. Thus, to the extent Deputy Weiss took his statement to mean that Burton was behind the wheel, that statement was not itself supported by reasonable suspicion. Because Deputy Blythe did not in fact know, or reasonably suspect, that the driver was Burton, his statement did not provide Deputy Weiss with an objectively reasonable basis for stopping the vehicle.

For the reasons set forth above, the Court concludes that Deputy Weiss did not have the reasonable suspicion necessary under the Fourth Amendment to justify the investigatory stop of Burton's vehicle. Assuming, as the Court has decided, that the traffic stop was invalid, Burton argues that all statements and evidence obtained as a result of the stop should be suppressed as fruits of the poisonous tree. Burton claims that the unlawful stop led to the discovery of the license plates, at which point law enforcement officers were able to run the plates and link Burton to the Ford Bronco seen on the surveillance video. Burton also claims that, as a result of the stop, he was placed in custody, *Mirandized*, and then unlawfully questioned by Officer Chvilicek about the Ford Bronco. Burton claims his answers ultimately led law enforcement to the Bronco's new owner, Rodney Trimble, who then directed law enforcement to firearms and other evidence

implicating Burton in the crimes with which he is has since been indicted.   Burton

moves to suppress everything in this evidentiary chain.

According to the government, however, law enforcement would have

inevitably discovered all of that evidence even without the unlawful traffic stop.

The government thus  argues suppression is not warranted based on the inevitable

discovery exception to the exclusionary rule.  "The inevitable discovery exception

to the exclusionary rule is available when the government demonstrates, by a

preponderance of the evidence, that it would inevitably have discovered the

incriminating evidence through lawful means."  *United States v. Lopez-Soto*, 205

F.3d 1101, 1107  (9th Cir. 2000).   The government can satisfy this "burden by

demonstrating that, 'by following routine procedures, the police would inevitably

have uncovered the evidence.'" *Lopez-Soto*, 205 F.3d at 1107 (*quoting United

States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989).

The government advances three arguments in support of its assertion that

law enforcement would inevitably have uncovered the evidence at issue.  First, it

states that law enforcement "would have continued their lawful investigation of

[Burton], which would have included questioning him at some point."  Dkt. 28, at

11.  The government points out that law enforcement knew the Ford F-250 was

registered to Burton, and maintains that at some point in the investigation deputies would have simply followed Burton until he reached a particular destination, and then questioned him. But the government did not present any evidence or testimony that it would have been routine practice for law enforcement officers to do so. Argument alone will not suffice.

Even if it had, in light of the fact that Burton promptly invoked his *Miranda* rights on the day in question, there is no reason to believe that he would have voluntarily answered any questions if law enforcement had simply waited for the opportunity to approach him. Nor is there any reason to believe that law enforcement would have found the Bronco's license plates under such a scenario. The Bronco's plates happened to be in the white sedan at the time of the illegal stop. There is nothing to suggest that law enforcement would have discovered the plates if they had followed Burton's Ford F-250. The license plates were critical for purposes of linking Burton to the Bronco.

Second, the government posits the conclusory argument that law enforcement would have continued to search for and inevitably located the Ford Bronco through "personal observation." Dkt. 42, at 18. But the government presented no evidence whatsoever in support of its argument. There certainly

exists some possibility that law enforcement may have located the Bronco in Lewis and Clark County – a 3,458 square mile county with a population of 63,395 individuals and 30, 867 housing units.[3]  But a possibility – even a probability – is not the same thing as inevitable.  *See United States v. Allen,* 159 F.3d 832, 842-43 (9th Cir. 1998).  And the government failed to present any evidence that law enforcement would have conducted a search of the records of the Motor Vehicle Division of the Montana Department of Justice and determined if a Ford Bronco had ever been registered to Burton or Harvey.

Likewise, Burton's response to Officer Chvilicek's improper questioning was critical for purposes of locating Trimble.  While Officer Chvilicek was entitled to ask Burton questions relating to his compliance with the conditions of his probation, asking him what happened to the Ford Bronco went beyond the scope of that permissible topic.  Because Burton had invoked his *Miranda* rights, Burton's answer was obtained in violation of *Miranda*.

Finally, the government argues it would inevitably have discovered Trimble's identity because Harvey independently identified "Rodney" as the owner of the Bronco when she was questioned by Detective Peterson later that

---

[3] *See* quickfacts.census.gov.

day.  But the record reflects that Detective Peterson first heard about "Rodney" from Deputy Weiss.  Not long after Officer Chvilicek questioned Burton, Deputy Weiss can be heard on the audio recording telling Detective Peterson that he "just heard [Burton] tell Chvilicek that he sold the Bronco to that other guy".  Gov't Ex 100, at 12:02:00 to 12:02:20.  Several minutes later, Deputy Weiss and Detective Peterson can be heard discussing the Ford Bronco and referring to "Rodney".  Gov't Exh. 100, at 12:11:05 to 12:11:30.  Thus, by the time Detective Peterson questioned Harvey, he already knew that Burton had sold the Bronco to guy named "Rodney."  This is consistent with Harvey's testimony, which was that when  Detective Peterson first spoke with her, he had already heard about "Rodney" and asked her who he was.  Dkt. 36, at 120.   Harvey may have confirmed what Detective Peterson already knew, which was that Burton had sold the Bronco to a man named "Rodney", but there is no way of knowing whether she would have voluntarily provided that information.

The Court thus concludes that the government has not met its burden of proving by a  preponderance of the evidence that law enforcement would inevitably have discovered the Bronco's license plates or Trimble's identity.  This means that any evidence provided by Trimble must also be suppressed, unless the

government can show that it discovered the evidence through independent means. *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000) (the government has the burden to show that the evidence is not "fruit of the poisonous tree.") (citation omitted). Because it is not clear exactly what evidence was obtained exclusively from Trimble and what evidence the government also obtained by independent means, the admissibility of specific evidence provided by Trimble will have to be considered by the presiding judge at the time of trial.

**B.    Voice Identification**

Burton has also moved in limine to exclude evidence that Officer Chvilicek identified his voice while listening to an audio recording from the robbery at Bowser's Casino.

Federal Rule of Evidence 901(a) provides generally that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." With regard to voice identifications, it is sufficient that there be an "identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

Fed. R. Evid. 901(b)(5).  As long as the identifying witness is "minimally familiar" with the voice he identifies, Rule 901(b) is satisfied.  *United States v. Plunk*, 153 F.3d 1101, 1022-23 (9th Cir. 1998).

Due process protects an accused against the introduction of evidence of unreliable pretrial identifications obtained through unnecessarily suggestive means.  *Moore v. Illinois*, 434 U.S. 220, 227 (1977).  Even where a pretrial identification is unduly suggestive, however, the identification is admissible if is nonetheless reliable under the totality of the circumstances.  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).   In assessing reliability, the court should consider: (1) the opportunity of the witness to observe the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation.  *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Burton argues that evidence of Officer Chvilicek's  voice identification was was obtained through impermissibly suggestive means because Lewis and Clark County Sheriff's Department deputies told Officer Chvilicek that Burton was a suspect in the Bowers's Casino robbery before they asked him to listen to the

voice on audio recording.

In his written report dated December 19, 2011, Officer Chvilicek described the voice identification as follows: "I was contacted by [Detective] Peterson who requested we return to [Burton's house] for another search following information he may be involved in the armed robbery of the casino last weekend. I reviewed tapes of the robbery and it appears the suspect may be Burton." Dkt. 32-1, at 4.

As Officer Chvilicek described it at the suppression hearing, he was walking by the city detectives' office after meeting with Burton at the detention center on December 19, 2011, when Detectives Ranalli and Lawrence asked him to come in and take a look at a video he was watching. Dkt. 36, at 78. Officer Chvilicek could see that the video was of a robbery, but he did not know that it had taken place at Bower's Casino. Dkt. 36, at 78. Officer Chvilicek identified Burton as the individual shown committing the robbery based on "[h]is voice, mannerisms, [and] the words he used." Dkt. 36, at 78. Detective Ranalli described things much the same way, writing in his report that Officier Chvilicek came to their officer, "viewed the video surveillance from the Bowers's robbery" and "[i]n listening to the audio from the robbery, [Officer] Chvilicek recognized the voice as that of David Burton." Dkt. 28-1, at 21.

The fact that Officer Chvilicek knew based on what had transpired earlier that day that Burton was a suspect in at least one residential robbery, and may have known that he was also a suspect in the Bower's Casino robbery, did not make the voice identification unnecessarily suggestive. Even if it did, the identification was nonetheless reliable under the totality of the circumstances. As Burton's probation officer, Officer Chvilicek was more than minimally familiar with Burton's appearance, mannerisms, and voice. Officer Chivilicek viewed the video just two days after the robbery had taken place. There is nothing to suggest that Officer Chvilicek was in any way distracted when he made the identification, and he did not express any doubt or uncertainty that the person on the video was Burton. Because Officer Chvilicek's voice identification was sufficiently reliable, it is admissible.

## III. Conclusion

For the reasons discussed above,

IT IS RECOMMENDED that Defendant's Motion to Suppress be GRANTED, and his motion in limine be DENIED. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel on or

before June 13, 2013. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (the court need not give the parties the full statutory period set forth in 28 U.S.C. § 636(b)(1) within which to file objections).

DATED this 4th day of June, 2013

Jeremiah C. Lynch
United States Magistrate Judge